UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

| | | |
|---|---|---|
| CHICAGO TITLE INSURANCE COMPANY, | ) | CASE NO. 1:09 CV 01063 |
| Plaintiff, Counter-Defendant, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | MEMORANDUM OF OPINION AND |
| AMY REGAL, | ) | ORDER DENYING RESOURCE |
| | ) | TITLE'S MOTION FOR A TEMPORARY |
| Defendant, | ) | RESTRAINING ORDER AND A |
| | ) | PRELIMINARY INJUNCTION, |
| | ) | GRANTING RESOURCE TITLE GULF |
| RESOURCE TITLE AGENCY, INC., et al., | ) | STATES' MOTION TO INTERVENE, |
| | ) | AND DENYING RESOURCE |
| | ) | PENNSYLVANIA'S MOTION TO |
| | ) | INTERVENE |
| Defendant, Counterclaimant, Third-Party Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, et al., | ) | |
| | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

_____

DISTRICT COURT JUDGE LESLEY WELLS

This matter began as an employee agreement non-competition case brought by
Chicago Title Insurance Company ("Chicago Title") against its former employee Amy
Regal ("Ms. Regal") and her new employer Resource Title Agency, Inc. ("Resource
Title").  (Docs. 1).  On 26 May 2009, after a hearing on the matter, the Court denied
Chicago Title's motion for a temporary retraining order and preliminary injunction on its
claims.  (Doc. 12).

- 1 -

Now before the Court, pursuant to their Answer, Counterclaim, and Third-Party Complaint (Doc. 13), is a motion for a temporary restraining order and preliminary injunction brought by Resource Title, Resource Title Gulf States – Alabama, LLC ("Resource Title Gulf") and Resource of Pennsylvania, LLC ("Resource PA") (collectively "Resource Title").  (Doc. 16).  Resource Title asks this Court to enjoin Third-Party Defendant Fidelity National Title Insurance Company ("FNTIC") from terminating Issuing Agency Agreements ("Agency Agreements") between itself and Resource Title and Resource Gulf States.[1]  Chicago Title submitted its brief in opposition, pursuant to Court Order (doc. 18), with a motion for leave, _instanter_, to exceed the page limit set by Local Rule 7.1(f), which the Court granted.  (Doc. 24; Non-document Order 23 June 2009).[2]

---

[1]As an initial matter, in its opposition brief Chicago Title challenges whether Resource Title Gulf and Resource PA are properly before the Court as Third-Party Plaintiffs, as neither affiliate of Resource Title motioned to intervene.  (Doc. 24).  Further, Chicago Title challenges, pursuant to Red. R. Civ. P. 12(b)(1), whether Resource PA has standing to bring this suit against FNTIC because Resources PA has, to date, not received a notice of termination of its Agency Agreement.  Id.  Resource Title sought to remedy these issues by motion before the Court to allow Resource Title Gulf and Resource PA to intervene, pursuant to Fed. R. Civ. P. 24.  (Doc. 27).

The Court will grant in part, and deny in part, Resource Title's motion to intervene.  Resource Title Gulf may intervene, as the evidence before the Court indicates (Resource Title, Preliminary Injunction Hearing ("PI") Exh. 37) that FNTIC terminated the Agency Agreement with Resource Title Gulf, effective 29 June 2009.

However, Resource Title has not demonstrated that Resource PA has standing to intervene in this matter as the Court has before it no proof of notice of termination from FNTIC involving Resource PA's Agency Agreement.

[2]Chicago Title motioned the Court (Doc. 34) to strike or disregard Resource Title's 22 June 2009 reply brief (Doc. 33) as untimely.  The Court grants Chicago Title's motion and will, accordingly, disregard the reply brief which was due before the Court no later than 18 June 2009.  (Doc. 18).

On 23 June 2009, the Court held a preliminary injunction hearing in which Resource Title presented testimony and submitted documentary evidence in support of its brief to enjoin FNTIC's actions to terminate the Agency Agreements with Resource Title and Resource Title Gulf.  The parties do not dispute that each of the Agency Agreements contains clauses allowing for termination, without cause, if the other party is provided a thirty-day written notice.

The Court heard testimony from Resource Title President Leslie Rennell and FNTG representative Stanley Hunter.  At the hearing, as it did in its motion, Resource Title argued for an injunction predicated on its claims of Sherman Act §§ 1 & 2 violations against FNTIC and Chicago Title, breach of contract against FNTIC, and tortious interference with business relations against Chicago Title.

From the testimony, documentary evidence and arguments presented in the briefs and by the parties at the hearing, the Court will find, for the reasons discussed below, that Resource Title and Resource Title Gulf have not demonstrated, by clear and convincing evidence, that they are substantially likely to succeed on the merits of their claims against either Chicago Title or FNTIC.  Further, the Court finds that Resource Title casts its discussion of irreparable harm almost entirely in terms of economic loss.


## I.      BACKGROUND

Fidelity National Financial, Inc., ("FNF") is a holding company for Fidelity National Title Group ("FNTG"), its wholly-owned subsidiary.  FNTG's wholly-owned subsidiary, Chicago Title and Trust Company's wholly-owned subsidiaries provide title insurance underwriting and related services, and include Chicago Title, FNTIC, Security Union

Title, Alamo Title, Commonwealth Land Title, Lawyers Title, and Ticor Title.  Both parties refer to these organizations as "brands."   Resource Title maintains that, "until recently" each separate 'brand' - i.e. Chicago Title and FNTIC - competed with each other even though owned by the same parent corporation, maintaining their own agency account representatives with their own underwriting requirements, premium remittance requirements, auditing and escrow requirements.  (Rennell Testimony, Tr. 6-7; PI Hearing Exhibit 7).  Chicago Title maintains that while these brands operate independently, they all have common parentage and work towards a common business goal.

There are four national underwriters for residential and commercial title insurance: Fidelity National Title Group; First American; Old Republic; and, Stewart. Resource Title relies upon FNTG's claims on its website to hold 46% of the market share in the underwriting of residential and commercial title insurance policies in the United States.  Ms. Rennell testified that Resource Title currently has agency agreements with First American and Old Republic in addition to the Agency Agreements with FNTIC.  (Rennell Testimony Tr 25).

Resource Title's Agency Agreement with FNTIC began on 20  January 2004 and was most recently amended on 24 February 2009.  At one time or another, the Agency Agreement covered the parties' business in the states of Ohio, Kentucky, Indiana, Michigan, Colorado, Tennessee, Florida, Louisiana, Mississippi, Arkansas, Georgia, Alabama, and Pennsylvania.

 The events precipitating Resource Title's claims against Chicago Title and FNTIC are the cancellation, by FNTIC, of Agency Agreements between Resource Title

- 4 -

and FNTIC (PI Hearing, Exhibits 25, 35), and between Resource Title Gulf and FNTIC

(PI Hearing, Exhibit 27, 37).  The Agency Agreement with Resource Title is slated to

expire on 26 June 2009, while the agency agreement with Resource Title Gulf will

expire on 29 June 2009.  (Doc. 16 p. 9).  FNTIC notified Resource Title on 20 May 2009

that it was terminating the agency agreement, and notified Resource Title Gulf of

termination of 27 May 2009.  On 27 May 2009 FNTIC notified Resource Title that the

termination was effective for all states covered in its Agency Agreement, not just in

Ohio.  (PI Hearing Exhibit 36).  Each of the Agency Agreements contains clauses

allowing for termination, without cause, if the other party is provided a thirty-day written

notice.  (PI Hearing Exhibit 24, Resource Title Agency Agreement, Section 8; Exhibit 25,

Resource Title Gulf Agency Agreement, Section 9).

As represented by Resource Title, and testified to by Ms. Rennell at the hearing,

the Agency Agreements allow independent title insurance agents, such as Resource

Title, to operate as agents for title insurance underwriters such as FNTIC and Chicago

Title.  The title insurance agent sells title insurance underwritten by a title insurance

underwriter, with the agent and underwriter typically splitting the premium, with the

agent keeping between 75% and 85% of the premium split.  (Doc. 16, p. 4).  Chicago

Title and FNTIC maintain that FNTG's revenue split between direct and agent

operations has remained roughly 55% agency operations and 45% direct operations.

According to Chicago Title and FNTIC, and uncontested at the hearing, the

Agency Agreements with Resource Title and Resource Title Gulf can subject FNTIC to

liability coverage of up to $250,000 per policy in nine states, and $1,000,000 per policy

in Alabama and Pennsylvania.  Chicago Title and FNTIC note that subjecting

- 5 -

underwriters to this liability requires "a high level of trust that the agent has its [the underwriters] best interests in mind."  FNTIC, further, maintains its relationship with Resource Title "had become adversarial in recent years," and points to Resource Title's efforts to hire away Amy Regal and Mark Cook as not the conduct of a "good, faithful and exemplary" agent in which FNTIC could place its trust.

Resource Title alleges that Chicago Title induced its 'sibling' corporation, FNTIC, to cancel the agency agreements: [1] in retaliation for Resource Title's hiring of Amy Regal and Mark Cook from Chicago Title; and [2] in an effort to "destroy competition in the title insurance market in Ohio and throughout the United States," to increase its market share and consolidate its dominant position in both agency and direct offices in the residential and commercial title insurance markets.  (Doc. 16, p. 3, 9-10).  Resource Title points to the alleged mingling of agency account representative and agency audit representative between FNTIC and Chicago Title.  Further, Resource Title alleges that representatives of Chicago Title approached representatives of FNTIC and those within the Ohio Agency Services Group demanding that FNTIC terminate the agency agreement with Resource Title, and sought to review Resource Title's customer lists and transactions with FNTIC, which were in the possession of the Ohio Agency Services Group.

According to Resource Title, FNTIC represented it would not cancel its agency relationship with an agency simply because another brand (such as Chicago Title) had terminated its relationship with that agency or the agency had cancelled its relationship with the brand.  Resource Title represents that, based on FNTIC's oral representations, Resource Title and Chicago Title mutually agreed to terminate their issuing agency

agreement.  (PI Hearing Exhibit 20).  Further, according to Resource Title, based on FNTIC's oral representations, Resource Title mutually terminated the National Agency Underwriting Agreement ("NAUA") with FNTG subsidiaries Lawyers Title, Commonwealth Land Title, and Transnation Title, an agreement that, according to Resource Title, could not be terminated without cause.

Chicago Title and FNTIC dispute Resource Title's characterization of the agreement by Resource Title to mutually terminate the NAUA with the above three underwriting subsidiaries of FNTG.  Chicago Title provides evidence that the NAUA agreement could, like all the other agreements, be terminated without cause, and further provides evidence that the three underwriters had already elected to terminate the Agency Agreements unilaterally and, instead, provided Resource Title the option to enter into a mutual termination agreement.  (Doc. 24, Exh. 6; PI Hearing FNTIC Exhibits 1, 2).  Finally, Ms. Rennell acknowledged, in her testimony, that these agreements could not be orally modified.  (Rennell Testimony Tr. 20-22).

Resource Title maintains that it currently has 1,467 opened orders from national default and/or REO customers in inventory which must be written on FNTIC paper due the customers' contractual relations with FNTG default subsidiaries.  (Rennell Testimony, Tr. 17).  Resource Title maintains it will loose approximately $880,200 in closing fees and in premium fees based on the total sales price for all orders, and funds it has advanced in exam fees and commitment fees waiting for contracts for sale to close.  (PI Hearing Exhibit 42).

## II.  BASIS OF LEGAL REVIEW

When deciding whether to grant a motion for a temporary restraining order, "a district court is to review factors such as the party's likelihood of success on the merits and the threat of irreparable injury."  Procter & Gamble Co. v. Bankers Trust Co., 78 F.3d 219, 226-27 (6th Cir. 1996).  The proponents must establish this by clear and convincing evidence.  Ohio Urology, Inc. v. Poll, 72 Ohio App.3d 446, 594 N.E.2d 1027 (1991).

Likewise, before issuing a preliminary injunction, a court must consider the following four factors:

> 1. Whether a movant has shown a strong or substantial likelihood or probability of success on the merits.
> 2. Whether the movant has shown irreparable injury.
> 3. Whether the preliminary injunction could harm others.
> 4. Whether the public interest would be served by issuing the preliminary injunction.

Mason County Medical Association v. Knebel, 563 F.2d 256, 261 (6th Cir.1977); Golden v. Kelsey-Hayes Co., 73 F.3d 648, 653 (6th cir. 1996).   These considerations are "factors to be balanced, not prerequisites that must be met."  In re DeLorean Motors Co., 755 F.2d 1223, 1229 (6th Cir.1985).  While the court must engage in this balancing test, "a plaintiff must always demonstrate some irreparable injury before a preliminary injunction may issue."  Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 104 (6th Cir.1982).

The nature and purpose of preliminary injunctions also inform the district court's analysis.  As the United States Supreme Court has explained, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a

- 8 -

trial on the merits can be held." Univ. of Texas v. Camenish, 451 U.S. 390, 395 (1981).

At the preliminary injunction stage, the trial court is not required to resolve "doubtful or difficult questions of law or disputed questions of fact." Montgomery v. Carr, 848 F.Supp. 770, 775 (S.D. Ohio 1993), quoting Intl. Molders' and Allied Workers Local Union v. Nelson (9th Cir. 1986), 799 F.2d 547, 551.


### III.  LEGAL ANALYSIS

### A.  Sherman Act Claims - Substantial Likelihood of Success on the Merits

#### 1.  Sherman Act § 1 Claims

Pursuant to Section 1 of the Sherman Act, Resource Title seeks to enjoin Chicago Title and FNTIC from terminating the agency agreements under either the per se or rule of reason analysis.  The per se analysis prohibits certain horizontal agreements among competitors as especially injurious.  The rule of reason applies to vertical restraints to competition involving acts such as vertical maximum price fixing and purely vertical boycotts.

Under either analysis, for Resource Title to receive an injunction, it must show a substantial likelihood of success on the merits, by clear and convincing evidence, that: (1) two legally distinct economic entities contracted, combined or conspired with each other; (2) the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets defined by the plaintiff; (3) the objects of and conduct pursuant to that contract or conspiracy were illegal; and (4) the plaintiff was injured as a proximate result of that conspiracy.  See Crane & Shovel Corp. v. Bucyrus-Erie Co., 854 F.2d 802, 805 (6th Cir. 1988).

Under the per se rule analysis, and relying on the Crane & Shovel factors, Resource Title maintains that because each of the FNTG "brands" has a history of competing against each other as independent concerns, the alleged collusion of FNTIC and Chicago Title formed a per se group boycott against Resource Title in refusing to contract with them.  (Doc. 16, pp. 12-14; Rennell Testimony, Tr. 6-8).

In support of its argument, Resource Title relies upon the analysis in the Sixth Circuit's decision in Nurse Midwifery Associates v. Hibbett, 918 F.2d 605, 614 (6th Cir. 1990).  The Court in Hibbett found a Section 1 Sherman Act violation in an instance where contracting physicians, who held medical staff privileges at a hospital, colluded to recommend the hospital withhold privileges from a competing physician.  Resource Title argues that Chicago Title and FNTIC colluded horizontally to effect a group boycott, as did the contracting physicians in Hibbett.

However, courts insist that a parent company and its wholly-owned subsidiary cannot conspire in violation of Section 1 of the Sherman Act.  See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 (1984).  Further, Chicago Title and FNTIC point to Sixth Circuit case law that forecloses Resource Title's per se analysis of horizontal collusion.  See Total Benefits Planning Agency, Inc., v. Anthem Blue Cross and Blue Shield, 552 F.3d 430 (6th Cir. 2008) (sibling corporations who were horizontal direct competitors with each other were incapable, as a matter of law, of conspiring to form a horizontal group boycott in violation of Section 1 of the Sherman Act);  Directory Sales Mgmt. Corp. V. Ohio Bell Tel. Co., 833 F.2d 606, 611 (6th Cir. 1987) (finding two wholly-owned sibling corporations cannot combine for the purposes of Section 1 of the Sherman Act).  See also Guzowski v. Hartman, 969 F.2d 211, 214 (6th Cir. 1992).

- 10 -

Further, Hibbett does not support Resource Title's argument that competing sibling corporations are separate entities for purposes of Section 1 where, in Hibbett, the Court found that members of the medical staff were not salaried employees of the hospital but were independent medical practitioners and did not share a unity of economic purpose with the hospital.

Alternatively, under a Sherman Act §1 rule of reason analysis, and relying upon the above factors laid down in Crane & Shovel, Resource Title argues for an injunction on the ground that Chicago Title and FNTIC are in vertical collusion to "produce anticompetitive effects."  (Doc. 16, pp. 14-16).  Resource Title identifies the relevant product market as the "Ohio and national residential and commercial title insurance market," which FNTIC and Chicago Title allegedly seek to control.  Resource Title further alleges that non-party FNTG, through Chicago Title, FNTIC, and others "controls approximately one-half of the title insurance market."  Resource Title maintains that it is "in danger of being injured by Chicago Title's and Fidelity Title's actions," and "the consuming public stands to lose a choice in the residential and commercial title insurance market" should these two 'brands' increase their market shares.

Resource Title has not demonstrated by clear and convincing evidence that it has a substantial likelihood of success on the merits of its Sherman Act § 1 rule of reason challenge.  First, Chicago Title and FNTIC are not two legally distinct entities.  Second, Resource Title has not clearly defined the relevant product market or demonstrated the defendants' power in that market.  Finally, Resource Title has not clearly defined the relevant geographic market to demonstrate that the defendants' actions produced anticompetitive effects.  See Mich. Div. Monument Builders of N. Am.

- 11 -

v. Mich. Cemetery Ass'n, 524 F.3d 726, 733 (6th Cir. 2008) (failure to identify the relevant market results in a dismissal of the plaintiff's section 1 Sherman Act claim).

Resource Title identifies the product market as the "residential and commercial title insurance market."  However, that product market is replete with sub-markets, including underwriting, issuing policies, performing title searches and closing and escrow services, some of which Resource Title does not operate in -- such as in underwriting.  Resource Title has failed to clearly define the relevant market.

Neither has Resource Title clearly demonstrated that Chicago Title and FNTIC possess the necessary market power for a rule of reason determination.  Resource Title's continued reliance on FNTG's underwriting market share as 46% of the market is misplaced.  That figure does not indicate Chicago Title and FNTIC's direct operations market share, which is the relevant question when, as is clear here, FNTG is not a party to the suit.  Instead, Resource Title has provided evidence that the 2008 market share for premiums written by Chicago Title was 12.79%, and by FNTIC was 8.69%; but even these figures include premiums written both directly and by affiliated and non affiliated agencies.  (PI Hearing, Exhibit 1).

Finally, Resource Title has not established the harm to competition in the identified markets by clear and convincing evidence, as it must for the grant of a preliminary injunction.  Any alleged injuries to Resource Title do not satisfy the requirement for "harm to competition."  See Brown Shoe Co., Inc., v. United States, 370 U.S. 294,320 (1962) (antitrust laws protect competition not competitors).

Upon review of the evidence presented by Resource Title, the Court finds that it has not shown by clear and convincing evidence that its Sherman Act § 1 claims, of

either horizontal or vertical collusion and restraint on trade, have a substantial likelihood of success on the merits.

## 2.  Sherman Act Section 2 Claims

Section 2 of the Sherman Act guards against monopolization or attempted monopolization.  The parties to this case do not dispute that to establish a claim of monopolization requires two elements:  (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition, maintenance, or use of that power by anticompetitive or exclusionary means.  See Directory Sales Management Corp., v. Ohio Bell Tel. Co., 833 F.2d 606, 612 (6th Cir. 1987).  Further, Courts observe that acts which would constitute an unlawful use of monopoly power are those "derived from [the monopolist's] power in the market or its size, . . . acts which could only have been performed by one with the requisite power."  Elex Corp. v. IBM, 510 F.2d 894, 926 (10th Cir.).  Anti-competitive conduct is conduct without legitimate business purpose.  Becker v. Egypt News Co., 713 F.2d 363, 366 (8th Cir. 1983).  A valid business purpose can offset a finding of monopolistic intent.  Byars v. Bluff City News Co., 609 F.2d 843, 853 (6th Cir. 1979).  Courts recognize that even a defendant who possesses monopoly power may refuse to deal with its competitors if there exist legitimate pro-competitive reasons for that refusal.  See Morris Communications Corp. v PGA Tour, Inc., 235 F. Supp. 2d 1269, 1283 (M.D. Fla. 2002);  Transhorn, Ltd v. United Techs. Corp., 502 F.3d 47 (2nd Cir. 2007).

Resource Title contends that FNTIC has or is attempting to assert monopoly power in the "residential and commercial title insurance market."  Resource Title refers to the geographic market as Ohio and, more broadly, the nation.

Resource Title has not clearly demonstrated the product and geographic market it asserts is being monopolized.  Without establishing the relevant markets, Resource Title's Section 2 claim for a preliminary injunction fails to provide evidence of a substantial likelihood of success on the merits.  See South End., 237 F. Supp. At 656, citing United States v. E.I. Du Pont De Nemours & Company, 351 U.S. 377, 393 (1956).

Resource Title's reliance on FNTG's website assertion that it has a 46% national market share of the underwriting business does not meet the preliminary injunction standard for its monopoly and attempted monopoly claims.  First, Resource Title does not compete nationally or in the underwriting market.  Second, Resource Title has not demonstrated Chicago Title or FNTIC's market share, and Resource Title does not allege any anticompetitive behavior by FNTG.  Third, asserting the 46% FNTG national market share in underwriting does not suggest that FNTG has monopoly power in a regulated market with competitive corporations Old Republic, Stewart Title, and First American.  See Mowery v. Standard Oil Co., 463 F. Supp. 762, 772 (N.D. Ohio 1976) aff'd without opinion 590 F.2d 335 (6th Cir. 1978) (controlling less than 50 percent of the relevant market is by itself sufficient evidence that monopoly power does not exist); Langenderfer v. S.E. Johnson Co. , 917 F.2d 1413, 1427 (6th Cir. 1990) (evidence of countervailing power precludes a finding of monopolization).  Fourth, Resource Title has not addressed FNTIC and Chicago Title's asserted monopoly power to control prices in light of the state regulation of the title insurance market.  See Nankin Hospital v.

- 14 -

Michigan Hospital Service, 361 F.Supp. 1199, 1210 (E.D. Mich 1973) (finding that Blue Cross could not possess monopoly power to fix prices or exclude competition in light of the state regulatory structure).

Finally, Chicago Title and FNTIC maintain they have a legitimate business reason for refusing to deal with Resource Title - the lack of trust that Resource Title will, in writing policies for which the defendants are financially liable in underwriting, have their best interests in mind after Resource Title's decision to hire away Amy Regal from Chicago Title.  FNTIC's refusal to deal with Resource Title, predicated on a legitimate business purpose does not necessarily implicate the conduct of monopoly power.   See Estey & Associates, Inc., v. McCulloch Corp., 663 F. Supp. 167 (D.C. Or 1986) (where a distributor's rights were terminable at will the substitution of distributors was merely an exercise of the right to deal or refuse to deal).  Resource Title has not made a clear and convincing demonstration otherwise.

Resource Title further claims that, through their conduct to terminate the Agency Agreements, Chicago Title and FNTIC are *attempting* to monopolize the residential and commercial title insurance business.  The merits of such a claim require a plaintiff to demonstrate (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power.  See Spectrum Sports v. McQuillan, 506 U.S. 447, 456 (1993).

A review of the record indicates that Resource Title has not demonstrated, by clear and convincing evidence, its substantial likelihood of success on the merits of its *attempted* monopolization claim.  First, in a "refusal to deal" matter, such as this, a finding of a legitimate business reason for the refusal forecloses a finding of predatory

- 15 -

or exclusionary conduct.  See Morris Communications Corp. v PGA Tour, Inc., 235 F.

Supp. 2d at 1283;  Technical Resource Services, Inc., v. Dornier Medical Systems, Inc.,

134 F.3d 1458, 1467 (11th Cir. 1998).  Chicago Title and FNTIC suggest the hiring

away of Ms. Regal, and the instant litigation, provide them with the proper business

reason to terminate their relationship with Resource Title as it has fatally undermined

the trust they must place in their agents who are capable of binding them with significant

liability. Second, pursuant to Nankin, 361 F. Supp at 1210, Resource Title has not

shown that it is likely to succeed in proving FNTIC and Chicago Title exhibit a

dangerous probability of achieving monopoly power where the relevant markets are

regulated and prices are set, as they are here, by state Departments of Insurance.

Accordingly, the Court will find that Resource Title has not demonstrated in Court

or on paper, by clear and convincing evidence, that its Sherman Act § 2 claim has a

substantial likelihood of success on the merits.


**B.    Valentine Act Claim**

Ohio's state analog of the Sherman Act, the Valentine Act, is interpreted in light

of federal construction of the Sherman Act.  See Johnson v. Microsoft Corp., 155 Ohio

App. 3d 626, 630 (Ohio Ct. App., Hamilton County 2003).  Because the Court finds that

Resource Title has failed to establish the likelihood of success on the merits to its

Sherman Act claims, by clear and convincing evidence, then the Court will also deny

injunctive relief on Resource Title's Valentine Act claim.  See Richter Concrete Corp. v.

Hilltop Basic Resources, Inc., 547 F. Supp. 893, 920 (S.D. Ohio 1981).

**C.     Breach of Contract Claim Against FNTIC -  Substantial Likelihood of Success on the Merits**

Resource Title maintains that FNTIC's termination action breached the Agency Agreements in place between Resource Title and FNTIC, and between Resource Gulf Title and FNTIC.  Resource Title argues that the third-party defendant terminated the Agency Agreements for no reason other than "the pressure from Chicago Title and the desire to monopolize the residential and commercial title insurance market." (Doc. 16, p. 21).  Resource Title relies upon Ohio law to maintain that the parties had binding agreements in which all contractual obligations were performed and that it, along with Resource Gulf Title, will suffer damages as a result of the breach.  See Garofalo v. Chicago Title Ins. Co., 104 Ohio App. 3d 94, 108 (8th Dist. 1995).

Because the express terms of the contracts support FNTIC's actions to terminate the Agency Agreements in writing with thirty-days notice and without cause, Resource Title also relies upon the understanding, under Ohio law, that every contract has an implied duty of good faith and fair dealing.  See American Contractor's Indemnity Co., v. Nicole Gas Production, Ltd., 2008 Ohio 5056 (Ohio App. 10 Dist Sept. 30 2008).

The evidence does not seriously challenge Resource Title's position that its economic performance met the conditions of the contract.  Ms. Rennell reiterates that position when she testified that Resource Title was meeting or exceeding FNTIC's premium remittance requirements.  (Rennell Testimony, Tr. 16-17).  However, Ms. Rennell acceded the point in her testimony that the Agency Agreements could be terminated without cause by either party, a benefit she bargained for as a financial

- 17 -

executive eminently familiar with contractual terminology.  (Rennell Testimony, Tr. 22-24).

Further, the Agency Agreement between FNTIC and Resource Title is expressly governed by the laws of the state of New York and not the state of Ohio.  As well, the Agency Agreement between Resource Gulf Title and FNTIC, are expressly governed by the laws of the state of Florida and not the state of Ohio.

Both Florida and New York recognize that an implied obligation of good faith and fair dealing will not override the express terms of the agreement between parties.  See Uwc, Inc., v. Eagle Indus., 213 A.D. 2d 1009 (N.Y. App. 1995); Ins. Concepts & Design, Inc. v. Healthplan Servs., 785 So. 2d 1232, 1234 (Fla. Ct. App. 2001);  see also Meruelo v. Mark Andrew of the Palm Beaches, Ltd., No. 4D07-4983, 2009 Fla. App. 4th Dist. May 6, 2009) (finding that the implied duty of good faith cannot be used to vary the fully specified, unambiguous terms of a contract).

Each of the two Agency Agreements allowed either party to terminate the contract without cause if thirty-days notice was provided in writing.  The parties do not dispute the FNTIC provided both Resource Title and Resource Title Gulf with proper notice of termination pursuant to the terms of the Agency Agreement.

The evidence before the Court, as well as the hearing testimony on Resource Title's Agency Agreements does not demonstrate, by clear and convincing evidence, that Resource Title has a substantial likelihood of success on the merits on its breach of contract claim against FNTIC.

**D.** **Tortious Interference with Contract Claim Against Chicago Title - Substantial Likelihood of Success on the Merits.**

Finally, Resource Title seeks a preliminary injunction upon its claim that Chicago Title intentionally interfered with Resource Title's and Resource Title Gulf's business relations with FNTIC.  Resource Title argues that Chicago Title placed pressure on FNTIC to terminate the Agency Agreements in retaliation for Resource Title's hiring away of Amy Regal from Chicago Title.  Resource Title points to the proximity of the cancellation letters to the current litigation, and to Chicago Title's, then, upcoming preliminary injunction hearing on 22 May 2009, regarding the alleged breach of Amy Regal's employment contract with Chicago Title.

As this claim sounds in tort, the Court turns to Ohio law to ascertain the standard. Under Ohio law, the elements of interference with contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) the lack of justification; and, (5) resulting damages.  See MedCorp, Inc., v. Mercy Health Partners, 2009 WL 580782 (Ohio App. 6 Dist, March 6, 2009).

To demonstrate, by clear and convincing evidence, a substantial likelihood of success on the merits of its tortious interference claim, Resource Title must, then, show a predicate breach of contract.  Yet, as discussed above, Resource Title has not demonstrated a breach of the express terms of the Agency Agreements, and under the applicable state law the duty of good faith cannot be used to thwart the bargained for, express terms of the Agreements. See Sony Elecs., v. Grass Valley Group, 2002 WL

440749 (Ohio App. 1 Dist., Mar. 22, 2002) (noting that a tortuous interference with a contract requires there be a breach).

Reviewing the testimony and evidence presented to the Court, Resource Title has not demonstrated, by clear and convincing evidence, the substantial likelihood of success on its tortious interference claim.


### E.    Irreparable Harm to Resource Title

In seeking a preliminary injunction, Resource Title maintains that FNTIC's termination action will cause it irreparable harm.  Ms. Rennell cursorily testified to the loss of reputation and presented a piece of evidence regarding a third-party's concern over the announcement by FNTIC of the termination of its Agency Agreement with Resource Title.  (Rennell Testimony, Tr. 17-19; PI Hearing, Exhibit 39).  Resource Title has been much more exacting in expressing the economic harm it will incur as a result of these Agency Agreement terminations.  (Doc. 42).

The Court does not consider the documentary or testimonial evidence presented by Resource Title sufficient to establish, by clear and convincing evidence, that it will suffer irreparable – i.e. non-economic – harm from the termination of their Agency Agreements with FNTIC.  The statements of reputational harm are insufficient to outweigh the evidence presented that Resource Title continues to enjoy underwriting relationships with Old Republic and First American.

As has long been the case, mere monetary injuries, as are expressed most concisely in this case, do not satisfy the irreparable injury standard for equitable relief in a preliminary injunction matter.   See Sampson v. Murray, 415 U.S. 61, 90-92 (1974).

### F.    Harm to Others

FNTIC maintains it will incur harm should the Court enjoin them from terminating the Agency Agreements with Resource Title.  FNTIC has expressed that harm in terms of interference with its freedom to contract, noting that while the Agreements require no cause for termination, "it's certainly cause enough when Resource Title hires key employees of one of its sister companies [ ] with the stated goal of taking one to three million [dollars] of revenue . . . there's nothing in America that would require us to do business with someone that is trying to harm the profits and management of the corporation."  (PI Hearing, Tr. 47).  See In re Tirenational Corp., 47 B.R. 647, 652 (Bankr. N.D. Ohio 1985)

The Court, further, observes that Resource Title's request to enjoin FNTIC from terminating the Agency Agreements calls for the kind of compulsory access that may well involve the Court in day-to-day or deal-by-deal supervision of the relationship between FNTIC and Resource Title.  Such intervention, characteristic of a regulatory agency, is not within the purview of the Court.  See Verizon Communications Inc. v. Law Offices of Curtis v. Trinko, LLP, 540 U.S. 398, 415 (2004).

These considerations weigh against awarding Resource Title a preliminary injunction in this instance which would force a continuing business relationship with FNTIC.


### G.    Public Interest

Resource Title couches the issue of whether the public interest is best served by awarding a preliminary injunction entirely in terms of its Sherman Act claims.

- 21 -

Specifically, Resource Title maintains the public interest will be harmed should Chicago Title and FNTIC be allowed to create a monopoly in the commercial and residential title insurance market.  (Doc. 16, pp. 22-23).

Given that the Court does not find Resource Title has demonstrated a substantial likelihood of success on the merits of its Sherman Act claims, the Court will, likewise, not find harm to the public interest predicated on those very claims sufficient to warrant a preliminary injunction in this matter.

### IV.  CONCLUSION

The Court grants Resource Title Gulf's motion to intervene and denies Resource PA's request to intervene.  The Court finds Resource PA does not have standing in this matter.

The Court has applied the legal standards for a preliminary injunction to the documentary evidence, testimony and arguments presented and finds them insufficient to show by a clear and convincing standard that Resource Title and Resource Title Gulf have a substantial likelihood of success on their Sherman Act, Valentine Act, breach of contract, or tortious interference claims.  Accordingly the Court hereby denies Resource Title's and Resource Title Gulf's motion for a temporary restraining order and preliminary injunction.

IT IS SO ORDERED.

  /s/Lesley Wells
UNITED STATES DISTRICT JUDGE

- 23 -